# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES BROWN, | Civil Action No. 11 - 1256 |
| Petitioner, | |
| v. | Chief Magistrate Judge Lisa Pupo Lenihan |
| BRIAN V. COLEMAN, THE DISTRICT ATTORNEY OF ALLEGHENY COUNTY, and THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA, | |
| Respondents. | |

## MEMORANDUM OPINION

Charles Brown (hereinafter referred to as "Petitioner") is a state prisoner currently incarcerated at the State Correctional Institution at Fayette. Pending before the Court is his Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. He challenges his February 1, 2002 judgment of sentence for attempted murder, aggravated assault, robbery of a motor vehicle, carrying an unlicensed firearm and recklessly endangering another person. Upon consideration of the submissions of both parties, the Court finds that Petitioner is not entitled to habeas corpus relief and his Petition will be denied.

### A. Relevant Factual and Procedural History

The facts of the crime as set forth by the Pennsylvania Superior Court in its Opinion dated March 10, 2011, are as follows:

> On April 21, 2000, [Petitioner] was charged with two counts of attempted murder and one count each of aggravated assault, burglary, reckless endangerment, robbery of a motor vehicle, carrying an unlicensed firearm, and

1

criminal mischief. On April 20, 2000, [Petitioner] broke into the Pittsburgh, Pennsylvania apartment of his former girlfriend, Lisa B., who was not present, and destroyed various items therein. A resident of the apartment building followed [Petitioner], noticed that [Petitioner] was armed, and telephoned police. Pittsburgh Police Officer Chris Wydra was dispatched to the building and *en route*, he encountered [Petitioner], who shot Officer Wydra in his side and stole his police vehicle. Officer Wydra was transported to a nearby hospital in critical condition.

On April 23, 2001, [Petitioner] proceeded to a non-jury trial, where the charges relating to the attempted murder of Lisa B. as well as the burglary and vandalism of Lisa B.'s home were withdrawn. After conducting a jury-trial-waiver colloquy, the court proceeded to hear the following evidence by means of stipulation. At approximately 5:45 p.m. on April 20, 2000, Pittsburgh Police Officers Bill Gorman and Chris Wydra were separately dispatched to an apartment building on Dawson Street in Pittsburgh based on a report that an armed intruder was on the premises. Officer Gorman arrived first and encountered Robert T., who informed him that [Petitioner] broke into Lisa B.'s apartment and fled the area armed with two handguns. Officer Gorman broadcast a description of the perpetrator and began to patrol the area.

As Officer Wydra was approaching the apartment building, he caught sight of [Petitioner], who was in the parking lot of Schenley Park Animal Hospital walking toward the Boulevard of the Allies. [Petitioner] matched the description of the suspect and signaled to Officer Wydra, who stopped his cruiser on Juliet Street and broadcast his whereabouts. [Petitioner] started to approach Officer Wydra and then stopped and fumbled with an object in his waistband. Officer Wydra yelled at [Petitioner] to display his hands when [Petitioner] pulled a revolver from his waist, pointed it at Officer Wydra, and emptied his gun. Officer Wydra was struck three times, twice in the bullet-proof vest and once in his side.

Officer Wydra retrieved his own weapon and returned three rounds before his gun malfunctioned. [Petitioner] sat down in the parking lot and started to fumble in his waistband a second time. Believing that [Petitioner] was retrieving another gun and unable to use his own, Officer Wydra retreated behind a parked car and reloaded a new magazine into his firearm. [Petitioner] approached Officer Wydra and then stopped when the officer pointed his gun at him. [Petitioner] entered the police cruiser and started to drive toward Officer Wydra, who fired additional rounds at the vehicle. [Petitioner] veered away from Officer Wydra as the cruiser was struck with bullets, and he crashed into a parked vehicle. Since [Petitioner] was no longer threatening to strike him with the police vehicle, Officer Wydra ceased firing and radioed for assistance. He was transported to a local hospital, where he remained overnight.

Other police officers arrived on the scene and initiated a search for [Petitioner], who had fled on foot after the crash. They discovered [Petitioner] concealed under debris in the shed of a nearby residence. In compliance with the officers' directive to come out and raise his hands, [Petitioner] displayed his hands, which were bloodied, but said that he was unable to leave the shed because he had been shot. [Petitioner] was removed and arrested. [Petitioner] "spontaneously stated he shot at that cop because he wanted to die and I wish he would have shot me." N.T. Trial, 4/23/01, at 24. Medical personnel were summoned to attend to [Petitioner], and he was transported to the hospital. Police recovered a .38 caliber gun at the scene but did not locate a second firearm.

The following day, Allegheny County Detective Chris Kerns went to the hospital to interview [Petitioner]. [Petitioner] was administered his *Miranda* warnings and asked about a missing .32 caliber weapon. [Petitioner] responded, "[D]on't you think if I had two guns I would have shot myself. There wasn't any .32." *Id*. at 24-25. [Petitioner] was informed that Officer Wydra was going to survive his wound, and he responded, "I wish he would have given me a head shot. The m___ f___ ain't going to pull up on me, I ain't stupid." *Id*. at 25. When asked why he shot at Officer Wydra, [Petitioner] responded that the officer had displayed his gun.

Lisa B. dated [Petitioner] for approximately one year prior to the incident, but they terminated their relationship shortly before April 20, 2000. [Petitioner] owned a .38 caliber handgun and a .32 caliber handgun, and Lisa B. found five rounds of .32 caliber ammunition and four rounds of .38 caliber ammunition in her apartment after the April 20, 2000 criminal episode and relinquished those items to police. Following their break-up, [Petitioner] unsuccessfully attempted to reconcile with Lisa B., and when she refused, he threatened to kill her. Additionally, in the past, [Petitioner] had told Lisa B., "that if she broke up with him, he would kill her then kill himself. He also made reference to wanting to go out in a gun fight with a cop. He stressed that to mean that he wanted to die in a gun fight with a cop." *Id*. at 26. Lisa B. did not believe that [Petitioner] would have carried through with his threats to kill her.

[Petitioner] vandalized Lisa B.'s, apartment on April 17, 2000, and April 18, 2000, and she began to stay with a relative. Lisa B. had spoken with [Petitioner] following the shooting, and he acknowledged that what he did was wrong but also believed that police had acted improperly. Specifically, [Petitioner] told Lisa B. that Officer Wydra shot and struck [Petitioner] as he was attempting to obtain his gun to give it to the officer and at that point, [Petitioner] returned fire and then took the cruiser to escape being killed. *Id*. at 27.

Robert T. witnessed [Petitioner] vandalize Lisa B.'s apartment on April 18, 2000, and also overheard him swearing and stating that he wanted to kill Lisa B. When [Petitioner] returned to the apartment on April 20, 2000, Robert T. was

3

> afraid that he would damage the apartment again and followed him. After seeing a gun in [Petitioner's] possession, Robert T. told him that he was going to telephone the police. [Petitioner] replied, "I don't care. I'm going to be arrested today, I will shoot a cop. [Petitioner] told [Robert T.], he had been back there two days, couldn't take it anymore, [Petitioner] said he would kill himself, wasn't going to jail." *Id*. at 29. [Petitioner] repeated that he planned to "kill a cop then kill himself." *Id*. After [Petitioner] placed his revolver to his head, Robert T. went to his own apartment and contacted police. [Petitioner] then called for Robert T., who told him that he had telephoned the police. [Petitioner] responded, "I don't care, I will shoot the m___ f___ cop, I will put a hole in my own head too." *Id*. at 30. At that point, [Petitioner] fled.

(Respondents' Exh. 9, ECF No. 14-4 at 1-6.)

Based upon this evidence, Petitioner was found guilty and convicted of attempted murder, aggravated assault, robbery of a motor vehicle, the firearms violation, and recklessly endangering another person. (Exh. 1, ECF No. 14-1 at 8; Exh. 9, ECF No. 14-4 at 6.) On February 1, 2002, he was sentenced to twenty to forty years imprisonment for attempted murder and to a consecutive jail term of five to ten years for robbery of a motor vehicle. (Exh. 1, ECF No. 14-1 at 2-3; Exh. 9, ECF No. 14-4 at 6.) No further penalty was imposed for the remaining counts. (Exh. 1, ECF No. 14-1 at 2-3.) The court recommended that Petitioner be incarcerated at a Mental Health State Correctional Facility. (Exh. 9, ECF No. 14-4 at 6.)

Through counsel, Petitioner filed a Notice of Appeal. (Exh. 1, ECF No. 14-1 at 10; Exh. 2, ECF No. 14-1 at 21.) On appeal, Petitioner raised four issues of ineffective assistance of counsel. (Exh. 3, ECF No. 14-1 at 23.) On May 28, 2003, the Pennsylvania Superior Court dismissed Petitioner's ineffectiveness claims without prejudice to his right to present them in post-conviction proceedings and affirmed Petitioner's judgment of sentence. (Exh. 1, ECF No. 14-1 at 14; Exh. 2, ECF No. 14-1 at 22; Exh. 3, ECF No. 14-1 at 23-24.)

On June 17, 2004, Petitioner wrote to the trial court requesting the appointment of counsel for purposes of filing a petition pursuant to Pennsylvania's Post-Conviction Relief Act

("PCRA"). (Exh. 1, ECF No. 14-1 at 14.) Counsel was appointed to represent Petitioner but she filed a "No Merit" letter and withdrew without filing a PCRA petition. (Exh. 1, ECF No. 14-1 at 14-15; Exh. 9, ECF No. 14-4 at 7.) Post-conviction relief was denied on December 7, 2004, and Petitioner appealed. (Exh. 1, ECF No. 14-1 at 15; Exh. 4, ECF No. 14-1 at 26.) On appeal, the Pennsylvania Superior Court reversed because counsel had improperly been permitted to withdraw without analyzing the questions that Petitioner sought to raise on the direct appeal. (Exh. 1, ECF No. 14-1 at 16; Exh. 4, ECF No. 14-1 at 27; Exh. 9, ECF No. 14-4 at 7.) The appellate court remanded for appointment of new counsel and the preparation of a petition raising these issues. (Exh. 1, ECF No. 14-1 at 16; Exh. 4, ECF No. 14-1 at 27; Exh. 9, ECF No. 14-4 at 7.)

New counsel was appointed who filed an Amended PCRA Petition on Petitioner's behalf. (Exh. 1, ECF No. 14-1 at 16; Exh. 5, ECF No. 14-2 at 1-19; Exh. 9, ECF No. 14-4 at 7.) An evidentiary hearing was held on June 27, 2008, after which the PCRA court denied relief on September 8, 2008. (Exh. 1, ECF No. 14-1 at 17; Exh. 7, ECF No. 14-2 at 24; Exh. 9, ECF No. 14-4 at 7.) Through counsel, Petitioner appealed. (Exh. 1, ECF No. 14-1 at 18; Exh. 6, ECF No. 14-2 at 21.) The PCRA court issued its Opinion on December 19, 2008, and the Pennsylvania Superior Court affirmed the denial of post-conviction relief on March 9, 2011. (Exh.1, ECF No. 14-1 at 18-19; Exh. 6, ECF No. 14-2 at 22; Exh. 7, ECF No. 14-2 at 24-27; Exh. 9, ECF No. 14-4 at 1-32.) Petitioner filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court, which was denied on September 12, 2011. (Exh. 1, ECF No. 14-1 at 18-19; Exh. 6, ECF No. 14-2 at 22.) He subsequently filed his Petition for Writ of Habeas Corpus in this Court on

September 21, 2011.[1] [2] (ECF No. 4.) In it, he raises two claims: (1) trial counsel was ineffective for failing to challenge any of the evidence presented by the Commonwealth, and (2) trial counsel was ineffective for failing to fully inform Petitioner of the ramifications of entering into a stipulated non-jury trial. Id.

**B. Discussion**

Petitioner presents two claims of ineffective assistance of trial counsel. These claims were raised in Petitioner's Amended PCRA Petition and on appeal to the Pennsylvania Superior Court. As such, the claims are exhausted for purposes of federal habeas review.

1. Standard of Review

This Court is required to review Petitioner's claims in accordance with the standard of review set forth in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). Specifically, Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[1] This is the filing date under the "mailbox rule." Pennsylvania and federal courts employ the prisoner mailbox rule. See Perry v. Diguglielmo, 169 Fed. Appx. 134, 136 n.3 (3d Cir. 2006) (citing Commonwealth v. Little, 716 A.2d 1287 (Pa. Super. Ct. 1998)); Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998). Under this doctrine, a prisoner's *pro se* pleading is deemed filed when delivered to prison officials for mailing. See Burns, 134 F.3d at 113; Commonwealth v. Castro, 766 A.2d 1283, 1287 (Pa. Super. Ct. 2001) (deemed filed when given to proper prison authority or placed in a prison mailbox).

[2] Respondents submit that the Petition for Writ of Habeas Corpus was untimely filed by three days. The Court found an error in Respondents' calculations and finds that the Petition was in fact timely filed by one day.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d).

In order to be entitled to relief, Petitioner must show that the Pennsylvania Superior Court's decision upholding the denial of the PCRA Petition was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.[3] This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) (internal citations omitted). The Petitioner carries the burden of proof.

"A state-court decision is 'contrary to' clearly established federal law[4] if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Few state court decisions will be "contrary to" Supreme Court precedent.

---

[3] Some circuit court of appeals have restricted their review under AEDPA to United States Supreme Court decisions alone. *See*, *e.g.*, Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (considering itself barred from examining "lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law"). The Court of Appeals for the Third Circuit, however, has concluded that decisions of federal courts below the level of the United States Supreme Court may be helpful to us in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as "helpful amplifications" of that precedent. Moore v. Morton, 255 F.3d 95, 105 (3d Cir. 2001) (quoting Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir.) (*en banc*), *cert. denied*, 528 U.S. 824 (1999)).

[4] "Clearly established Federal law" should be determined as of the date of the relevant state-court decision. Greene v. Fisher, 606 F.3d 85, 95 (3d Cir. 2010), *aff'd*, Greene v. Fisher, 132 S. Ct. 38 (2011).

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. A state court ruling is an "unreasonable application" if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply. Harris v. Ricci, 607 F.3d 92, 96 (3d Cir. 2010).

The Court of Appeals for the Third Circuit has outlined the proper review of state court decisions under AEDPA in Harris. In describing a federal court's role in habeas review, the Court of Appeals for the Third Circuit explained as follows:

> . . ., we cannot decide this case on the basis of any of those authorities because, as we noted at the outset, this case is governed by AEDPA. Harris must show that the New Jersey Supreme Court's decision upholding the use of foreign jurors to ameliorate the effects of the pretrial publicity was contrary to law clearly established by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). Even Harris concedes that the Supreme Court has never squarely considered this issue.
>
> A recent decision of the Supreme Court illustrates its deferential approach to the state courts' decisions, even in the face of what appears to be its doubt about the merits of that decision. In Renico v. Lett, ___ U.S. ___, 130 S. Ct. 1855, 1861-62 (2010), the Court reviewed the Sixth Circuit's grant of a writ of habeas corpus to a defendant who was retried for murder following the trial judge's grant of a mistrial after the jury "had deliberated for at least four hours following a relatively short, and far from complex, trial . . . ." The Michigan Supreme Court had concluded there was no violation of the Double Jeopardy Clause because the trial court exercised its sound discretion. The federal district court granted a writ of habeas corpus, and the Sixth Circuit affirmed, both concluding that the trial court's declaration of a mistrial constituted an abuse of discretion because there was no manifest necessity.
>
> The Supreme Court reversed and its reasoning is instructive here. It stated that the question "is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so-the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was 'an unreasonable application of . . . clearly established

> Federal law,'" and it later explained that the application must be "objectively unreasonable." In reversing the Court of Appeals, the Court stated in a footnote, "whether the trial judge was right or wrong is not the pertinent question under AEDPA." It noted that the Michigan Supreme Court's decision, "while not necessarily correct – was not objectively unreasonable."

Harris, 607 F.3d at 98-100 (internal footnotes, citations and quotations omitted).

A federal court must also accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. Id. (citing Marshall v. Longberger, 459 U.S. 422, 433 (1982)). Where the state court fails to adjudicate or address the merits of a petitioner's claims, unless procedurally defaulted, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

Thus, the question for review is whether the Pennsylvania Superior Court's determination that Petitioner's trial counsel was not ineffective was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented.

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)). *See also* Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so

9

upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. The first prong of the Strickland test requires a petitioner to establish that his attorney's representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. To satisfy this prong, a petitioner must show that any errors made were so serious as to deprive the petitioner of counsel as guaranteed by the Sixth Amendment. DeShields v. Snyder, 830 F. Supp. 819, 824 (D. Del. 1993) (also citing Strickland). In making such a determination, a court is to look to the totality of the circumstances. Id. On review, the Court is to presume that the attorney's conduct falls within the realm of objective reasonableness and it is the burden of the petitioner to show otherwise. Id. "Judicial scrutiny of counsel's performance must be highly deferential." Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (citing Strickland). "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id., *see also* McBride v. Superintendent, SCI Houtzdale, 687 F.3d 92, 102 (3d Cir. 2012) *cert. denied*, 133 S. Ct. 999 (U.S. 2013) ("We must eliminate the distorting effects of hindsight and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.") (internal citations and quotations omitted). Defense counsel has never been required to pursue every claim or defense, regardless of merit, viability, or reasonable chance for success. Knowles, at 123 and 127 ("The law does not require counsel to raise every available nonfrivolous defense. Counsel is not required to have a tactical reason—above and beyond a

reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether.") (internal citations omitted).

The second prong of Strickland requires a petitioner to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. Id. A showing of reasonable probability may not be based on mere speculation. United States v. Gray, 878 F.2d 702, 712 (3d Cir. 1989) (refusing to find that the "prejudice" prong of Strickland could be met where the prejudice was based solely on speculation as to what an absent witness may have testified to). A petitioner is not entitled to relief unless he makes *both* showings. 466 U.S. at 687 (emphasis added).

In analyzing Petitioner's claims under the two-part test announced in Strickland, this Court must apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings. The question of effectiveness of counsel under Strickland is a mixed question of law and fact; it requires the application of a legal standard to the historical, fact determinations. Berryman v. Morton, 100 F.3d 1089, 1095 (3d Cir. 1996). In this regard, a state court's finding that counsel had a trial strategy is a finding of fact to which the presumption applies. Id. Likewise, a state court's determination that a decision was a tactical one is a question of fact. Id. A state court's determination of whether such strategy or decision was reasonable, however, is a question of law. Id. *See also* McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir.) ("[A] state court's conclusion that counsel rendered

effective assistance is not a finding of fact subject to deference by a federal court."), *cert. denied*, 510 U.S. 1028 (1993).

    2. <u>Ineffective Assistance of Counsel Claims</u>

Petitioner claims that his trial counsel was ineffective for failing to challenge the Commonwealth's evidence and for failing to fully inform him of the ramifications of a stipulated non-jury trial. Following an evidentiary hearing conducted on June 27, 2008, the PCRA trial court denied relief concluding that it was "clear from the record that the Commonwealth's evidence was overwhelming, and without contradiction, as evidenced by the Petitioner's own statement to the police." (Exh. 7, ECF No. 14-2 at 27.) Additionally, it found that counsel had "fully and adequately explained the concept of a non-jury trial to the Petitioner. The Petitioner executed a written colloquy supplemented by an oral colloquy waiving his right to a jury trial." <u>Id</u>. To the extent that there was any merit to Petitioner's allegations, the court stated that trial counsel's "strategy was to minimize, to the extent he could, the severity of his client's sentence" because he believed "his chances of successfully defending Petitioner as slim and none." <u>Id</u>.

On appeal, the Pennsylvania Superior Court went to great lengths to explain how and why the <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), standard for ineffectiveness applied to Petitioner's claims instead of the standard announced by the United States Supreme Court in <u>United States v. Cronic</u>, 466 U.S. 648 (1984), which was decided the same day as <u>Strickland</u> and which Petitioner argued was applicable instead of <u>Strickland</u>. *See* (Exh. 9, ECF No. 14-4 at 11-25.) In <u>Cronic</u>, the Supreme Court held that a defendant's conviction must be automatically reversed without any specific showing of prejudice "when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding" or where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing[.]" <u>Cronic</u>, 466

U.S. at 659 n.25. "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." Id. at n.26 (citing Strickland, 466 U.S. at 693-96).

Petitioner maintained that when trial counsel allowed the Commonwealth to proceed through means of a non-jury stipulated trial, he "was placed in the position of not having the assistance of counsel for his defense." (Exh. 9, ECF No. 14-4 at 11) (citing Petitioner's appellate brief at 16). After a lengthy analysis detailing the differences between Cronic-type errors versus Strickland-type errors, the appellate court concluded that trial counsel clearly had not wholly failed to function as Petitioner's counsel within the meaning of Cronic, and, therefore, Petitioner was not entitled to an automatic reversal of his conviction. Id. at 11-25. In reaching this conclusion, the Superior Court first noted that Petitioner relinquished his rights to a jury trial through both written and oral colloquies and that the record established that Petitioner understood the written jury-trial waiver and had executed it knowingly and voluntarily. Id. at 22-23. Next, it noted that by proceeding to a full trial, the Commonwealth still had to prove its case beyond a reasonable doubt and the stipulated non-jury trial was by no means the functional equivalent as a guilty plea like the United States Supreme Court found in Brookhart v. Janis, 384 U.S. 1 (1966). Id. at 23. The appellate court found that, in Petitioner's case, the stipulated evidence itself established a viable defense that he did not act with the specific intent to establish attempted murder, and trial counsel appropriately argued such during closing argument.[5] Id. at

---

[5] Specifically, Petitioner had told police that he wanted to kill himself and that he fired because Officer Wydra drew his weapon first. This evidence was consistent with that of Lisa B.'s testimony that Petitioner told her that he was fired upon before he returned fire. Moreover, Robert T. described Petitioner's mental state on the night in question as "unstable" and his actions and statements as "bizarre." Id. at 22-23.

23-34. The Superior Court then detailed trial counsel's testimony at the evidentiary hearing held before the PCRA trial court on June 27, 2008, and, specifically, noted that counsel was an experienced criminal attorney who reviewed the material he was given during discovery, went to the scene of the crime, interviewed Petitioner, had discussions with his family and consulted another attorney. Id. at 24. Counsel had decided to proceed to a stipulated non-jury trial on only one other occasion and chose to do so in Petitioner's case "because he knew the trial court to be thoughtful and intelligent, because he wanted to retain [Petitioner's] right to appeal, and because he believed that [Petitioner] would fare better at sentencing by proceeding to a stipulated non-jury trial." Id. Importantly, however, the court noted that counsel actually presented the defense that Petitioner wanted him to present, which was that he was attempting to commit suicide by having Officer Wydra shoot him. Id. Therefore, it concluded that Petitioner's claim that "trial counsel failed to function in the capacity for which he was appointed," was refuted by the record and "there was no actual or constructive denial of representation by counsel sufficient to invoke Cronic[.]" Id. at 25.

Applying Strickland instead, the appellate court addressed each of Petitioner's complaints regarding trial counsel's performance for allegedly failing to challenge any of the Commonwealth's evidence and found each to be without merit.[6] Id. at 25-28. Thus, it concluded that the PCRA trial court did not err in finding that counsel did not render ineffective assistance as to Petitioner's first claim. Id. at 28.

The Superior Court also disagreed with Petitioner's second position that trial counsel was ineffective because he did not adequately explain to Petitioner that the effect of proceeding by

---

[6] Petitioner alleged that trial counsel was ineffective for failing to conduct any pre-trial investigation, locate and interview witnesses for the defense, take statements from Commonwealth witnesses for use during cross-examination, interview and prepare Petitioner for trial, prepare a proper defense for the crimes charged, and keep Petitioner informed of the status of his case prior to trial.

stipulation was to relinquish his constitutional right to confront and cross-examine witnesses. Id. at 28-32. Albeit a five-year gap between Petitioner's trial and evidentiary hearing, the appellate court noted that trial counsel testified that he likely discussed the issue with Petitioner "as a matter of course" and could not imagine that he did not do so especially given that they were proceeding by stipulated non-jury trial, something that he had only done once before in his career. Id. at 28-29. Trial counsel testified that because they proceeded in the manner in which they did he "would not have overlooked that important issue." Id. Therefore, the appellate court agreed that counsel did not render ineffective assistance in this regard. Id. at 29.

On habeas review, Petitioner has failed to demonstrate that the state court's conclusion that counsel did not render ineffective assistance in the manner alleged was contrary to or an unreasonable application of clearly established federal law; nor has Petitioner shown that its determination was an unreasonable application of the facts in light of the evidence presented. Petitioner's arguments to the contrary are clearly without merit and reveal nothing more than his dissatisfaction for proceeding to trial in the manner in which counsel suggested and he voluntarily and knowingly chose. Moreover, as the Pennsylvania Superior Court correctly noted, Petitioner's stipulated non-jury trial was not the equivalent of a guilty plea, and, during closing arguments, trial counsel argued that the Commonwealth had not met its burden of proof because the stipulated evidence did not demonstrate that Petitioner acted with the intent to kill.

Nevertheless, and notwithstanding the stipulated facts presented at his non-jury trial, Petitioner overlooks the overwhelming evidence of his guilt, which would have been presented had he chosen to proceed to a trial by jury. Specifically, he was caught immediately after the shoot-out with Officer Wydra, was found shot with blood on his hands, and, most importantly, made numerous voluntary statements to the police admitting to shooting the officer because he

"wanted to die." Therefore, even giving credence to Petitioner's claim that counsel's conduct fell below the standard of reasonable professional assistance by stipulating to the facts presented at Petitioner's trial, no prejudice can be shown because a trial by jury would not have produced a different result. As such, Petitioner is not entitled to habeas relief on his first claim.

Petitioner's second claim is that counsel was ineffective for failing to fully inform him of the ramifications of proceeding to a stipulated non-jury trial. In this regard, the Court notes that many of Petitioner's arguments are contradictory. For example, Petitioner claims that trial counsel "persuaded" him to waive his rights to a trial by jury and agree to a stipulated non-jury trial, but he also argues that counsel never met with him prior to trial and he did not know he had a constitutional right to a jury trial or to confront the witnesses against him and did not give counsel permission to waive those rights on his behalf. He states that he was never informed that he would effectively waive his constitutional rights by proceeding with a stipulated non-jury trial. Again, the record clearly refutes Petitioner's claims. Petitioner's averment that he did not know he had a right to a trial by jury is incredible and the record establishes that he knowingly waived this right by both written and oral colloquies. Trial counsel stated at the evidentiary hearing that, although he could not remember Petitioner's case with specificity, he undoubtedly discussed with him the consequences in proceeding by stipulated non-jury trial because he did so "as a matter of course" and definitely would have done so in this situation given the rarity in proceeding in such a manner. Moreover, trial counsel stated that his strategy in proceeding before the judge on stipulated facts was to minimize the severity of his client's sentence given that the chance of success at a jury trial was effectively zero. Notwithstanding the fact that the court must presume counsel's strategy to be reasonable, in this case it was more than reasonable and Petitioner has failed to show otherwise. Again, even assuming counsel's conduct fell below

the standard of reasonable professional assistance, Petitioner has failed to show any prejudice that may have resulted by counsel's alleged failure to have discussed with him the consequences of a stipulated non-jury trial; in other words, by unknowingly and involuntarily waiving his right to a jury trial. There can be little question that the result of a jury trial would not have been different. Thus, Petitioner is also not entitled to habeas relief on his second claim.

## C. Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. As provided for in 28 U.S.C. § 2253, "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Applying these standards here, Petitioner has not made the requisite showing in these circumstances. Accordingly, a certificate of appealability will be denied.

## D. Conclusion

For the foregoing reasons, Petitioner's Petition for Writ of Habeas Corpus (ECF No. 4) will be denied and a certificate of appealability will also be denied. A separate order will follow.

Dated: August 1, 2013

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Charles Brown
 EX-1730
 S.C.I. Fayette
 P.O. Box 9999
 LaBelle, PA  15450-0999
 *Via First Class Mail*

 Counsel of Record
 *Via ECF Electronic Mail*